FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUN 11 2018

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRIC COURT
NORTHERN DISTRICT OF GEORGIA

CHARLES A. RUFAI,                    )        **JURY TRIL DEMAND**

              Plaintiff,             )
                                     )        Civil Action No
vs.                                  )
                                     )        **1:18-CV-2830**
GUIDED THERAPEUTICS, INC             )
MR. CARTWRIGHT S. CARTWRIGHT –
PRESIDENT & CEO - DIRECTOR
MICHAEL C. JAMES -DIRECTOR
JOHN E. IMHOFF - DIRECTOR
LINDA ROSENSTOCK - DIRECTOR
JONATHAN NILOFF - DIRECTOR
GPB DEBT HOLDINGS II, LLC
EVANS MYRIANTHOPOLOS,
Individually, Jointly, severally and in
the Alternative.

              Defendants.

**THIS IS A NEW FILING.**

**THE PREVIOUS FILING WAS DISMISSED WITHOUT PREJUDICE ON
MAY 11TH, 2018, UNDER FILE NO. 1:17-CV-2564-CC-CMS**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHARLES A. RUFAI )
)
Plaintiff )                    CIVIL ACTION FILE NO
)
v. )
)
                               COMPLAINT
GUIDED THERAPEUTICS, INC )     AND JURY TRIAL DEMAND
GENE S. CARTWRIGHT – )
PRESIDENT & CEO – DIRECTOR )
MICHAEL C. JAMES -DIRECTOR )
JOHN E. IMMHOFF – DIRECTOR )
LINDA ROSENSTOCK – DIRECTOR )
JONATHAN NILOFF – DIRECTOR )
GPB DEBT HOLDINGS II LLC,
EVANS MYRIANTHOPOULOS
)
)
Individually, jointly, severally and in )
the alternative )
)
Defendants )
_____ )

## I. **INTRODUCTION**

1. Charle Rufai (Plaintiff) brings this action pursuant to Title VII of the Civil

Rights Acts of 1964 (as amended) 42 U.S. C § 2000e, et. seq (Title VII), the

Federal Age Discrimination in Employment Act of 1967 as Amended, 29 U. S. C §

621 et. Seq. (ADEA), the Dodd Frank 15 U.S.C. § 78u-6(h)(1)(A) (iii) and the

1

621 et. Seq. (ADEA), the Dodd Frank 15 U.S.C. § 78u-6(h)(1)(A) (iii) and the

Sarbanes -Oxley Act 18 U. S. C § 1514A , 42 USC §1981 and Georgia labor Law

OCGA §34-7-2 and Georgia Law governing Tortious Interference with Business

Relations.

The 55 year old dark skinned African American Plaintiff of Nigerian origin

contends that Guided Therapeutics Inc., its board of directors and its CEO and

President Gene Cartwright, discriminated against him based on his age, race, color

and national origin and when they terminated Plaintiff's employment after 81/2 of

employment as controller of Guided Therapeutics in order to replace him with a

younger fair skinned Hispanic male. The aforementioned defendants also retaliated

against Plaintiff for engaging in protected activity in opposing discrimination and

for making disclosures protected under Dodd Frank and the Sarbanes Oxley act.

Plaintiff also contends that Defendants GPB Debt Holdings II LLC and its CEO

Defendant Evans Myrianthopolus (Evans)  tortiously interfered with Plaintiff's

economic advantage and violated his rights under the Equal Credit Opportunity

Act (ECOA), 15 U.S.C. § 1691, and the anti- discrimination and the

discouragement regulation  of 12 CFR 1002.4 (a) (b) when GPB conditioned its

loan to Guided Therapeutics upon the requirement that Plaintiff be terminated as

Controller of Guided Therapeutics based on his race and National origin.

Plaintiff seeks declaratory relief, compensatory and punitive damages.

## II. **JURISDICTION AND VENUE**

2. This Court has jurisdiction over this action pursuant to 28 USC § 1331 which gives district courts original jurisdiction over civil actions arising under the constitution, laws or treaties of the United states. This Court has jurisdiction pursuant to 28 USC § 1343 (3) (4) which gives jurisdiction over actions to secure civil rights extended by the United States Government. This Court also has supplemental jurisdiction over State Law Claims pursuant to 28 U.S. C. § 1367. Venue is appropriate in this judicial district under 28 U.S. C. § 1391 (b) because the events that gave rise to this complaint occurred in this district.

## III. **PARTIES**

3. Charles A. Rufai (Plaintiff) is a Certified Public Accountant who was hired as a Controller by Guided Therapeutics on June 11, 2007 to manage its Accounting Department.

4. Plaintiff resided at 2824 Legislative Lane, Georgia while employed by Guided Therapeutics.

5. After termination from Guided Therapeutics, Plaintiff could no longer maintain a home in Georgia, as such, Plaintiff moved to New Jersey to live with relatives at 364 S. 11th Street. Newark, NJ 07103.

6. Guided Therapeutics, Incorporated (Defendant Guided Therapeutics) is a medical technology company that develops biophotonics solutions for the non-invasive detection of cancer.

7. Guided Therapeutics has 26 employees and has an address of 5835 Peachtree Corners East. Suite D. Norcross, GA 30092.

8. The board of directors of Guided Therapeutics consisted of: Mr. Michael C. James; Dr. John E. Immhoff; Dr. Johnathan Niloff; Dr. Linda Rosenstock and Mr. Gene Cartwright.

9. Most members of the board of directors of Guided Therapeutics resided in Georgia during all relevant periods.

10. Gene Cartwwight  (Defendant Cartwright)was the CEO and President of Guided Therapeutics during all relevant periods.

11. The Board of Directors is responsible for evaluating, reviewing and approving actions taken by Guided Therapeutics Inc.

12. Guided Therapeutics is a publicly traded company.

4

13. GPB Debt Holdings II LLC, ( Defendant GPB Debt Holdings or GPB) was the lender of $1 Million dollars loan to Guided Therapeutics. GPB has an address of 810 7th Avenue, 18th Floor. New York, NY 10019.

14. Evans Myrianthopoulos (Defendant Evans) is the CEO of GPB Debt Holdings II LLC.


## IV. FACTUAL ALLEGATIONS

15. Plaintiff is a 56- year- old dark skinned African American Male of Nigerian origin who speaks with a Coarse accent.

16. Plaintiff became employed by Guided Therapeutics Inc. on June 11, 2007 as a Controller.

17. Plaintiff was hired as a full time employee with benefits.

18. Plaintiff was responsible for preparation and filing of financial statements with the Securities Exchange Commission (SEC). Plaintiff was also responsible for Securing Security Exchange Commission (SEC) forms, 10Q, 10K and S1, completions of audits, completion of S1 filing, and or up- listing  as well as other financial and accounting matters as directed by Defendant Guided Therapeutics.

19. Prior to his termination, Plaintiff worked for Guided Therapeutics without incident for 81/2 years.

20. Plaintiff's SEC filings on behalf of Guided Therapeutics were always timely and successful.

21. During his employment, the company expressed no concern with Plaintiff's ability to perform his job.

22. Ninety percent of Defendant Guided Therapeutic's employees were Caucasians and all members of the Board of Directors were Caucasians.

23. After working for Defendant Guided Therapeutics for eight and a half (8 ½) years, with various prior multi million dollars loans and grants issued and awarded to the Company, a new loan was granted by Defendant GPB Debt Holdings II, LLC

24. The loan was in the amount of $1 million, fully collateralized which had a restriction, imposed by the Defendant Evans of GPB.

25. Defendant Evans required that as a condition for granting the loan to Guided Therapeutics, that Plaintiff be replaced as the Controller by GPB's own appointed Controller (James Clavijo, of Capital View Partners).

26. Accountant James Clavijo was a younger male who was Hispanic with a fair complexion.

27. The Consulting Agreement that governed James Clavijo's employment did not indicate that he would be a CFO. He was being hired as a consultant.

28. Accountant James Clavijo's salary was to be paid in advance while Plaintiff was owed approximately three months of un-paid wages and benefits.

29. On February 12, 2016, Mr. James Clavijo sent an email to Defendant Cartwright stating "Charles can't be in charge of driving this progress"

30. On various occasions, Defendant Evans would pretend not to understand Plaintiff when he spoke and Defendant Gene Cartwright would translate Plaintiff's words to Defendant Evans.

31. Defendant Gene Cartwright agreed to the Terms of the loan, to replace the dark skinned Nigerian Plaintiff as the Company's Controller with the fair skinned Hispanic male.

32. On February 13, 2016, Plaintiff had sent an email to the Board of Directors, Auditors, and Outside Legal Counsel regarding violations of SEC, FINRA, PCAOB, Sarbanes Oxley rules.

33. Defendant Cartwright while working from home on February 15th, 2016, called the office and informed an employee that "I will have to let Charles go."

34. Plaintiff expressed that it was unethical to pre pay a consultant a month in advance for work that Plaintiff could perform when Plaintiff at that time was owed approximately three months salary and his health benefits were not paid prohibiting him (a diabetic) from using his insurance to buy insulin or from seeing his doctor.

35. Plaintiff expressed that it was unethical for GPB an investor/Lender to advise  Guided Therapeutics what bills were to be paid first.

36. Plaintiff expressed concern in said email that imposition by an investor of day to day conditions upon clients could be construed as "controlling" by the investor and can be viewed as having insider's knowledge of their client's non- public information which was a clear violation of the FINRA, SEC, Sarbanes-Oxley & PCAOB Rules.

37. The Plaintiff expressed in his email that granted that [Defendant Guided Therapeutics] can benefit tremendously from having a CFO (such as Plaintiff?) with good understanding of Complex debt & Equity Financing,

8

the financing activities and that reporting should be separated from General Accounting Controlling.

38. On February 13, 2016, the day that Plaintiff had sent the email related to insider trading, Defendant Gene Cartwright stated " I guess we will have to let Charges go we will ask the staff under oath for a statement."

39. On March 29, 2016, Defendant Cartwright advised Plaintiff that "Evans does not want you a Nigerian managing their funds"

40. Mr. Evans also requested that the newly appointed Accountant's salaries was to be paid in advance.

41. There was no mention by Defendant Evans, Defendant Cartwright or discussion by Guided Therapeutics Board of Directors that wages or benefits that were owed to Plaintiff would be paid.

42. The SPA in relevant part stated that "for as long as the Lead Investor holds a note, the Company shall appoint and retain a Chief Financial Officer or Controller mutually acceptable to the company and the Lead Investor." (Ex1)

43. The SPA identified GPB Debt Holding II LLC as the Lead Investor.

44. **The Board of Directors including: Mr. Michael C. James; Dr. John E. Immhoff; Dr. Johnathan Niloff; Dr. Linda Rosenstock  and Gene Cartwright voted to approve the loan and Gene Cartwright signed off on the related Securities Purchase Agreement agreeing to GPB's discriminatory requirement that Plaintiff should be replaced by James Clavijo as Controller .**

45. Defendant Gene Cartwright, the Company's CEO notified Plaintiff that he was being replaced as the Company's controller.

46. On March 29th, 2016, Defendant Cartwright issued Plaintiff a separation letter that stated that Plaintiff's termination was due to "Lack of Work."

47. A March 29th, 2016 e-mail from Mr. Cartwright also indicated that Plaintiff's termination "obviously has nothing to do with [Plaintiff's] performance".

48. Upon Plaintiff asking Defendant Cartwright the reason for his termination, Defendant Cartwright simply stated "Charles, I just have to let you go now. I will pay you a week's salary for every year served."

49. Defendant Cartwright also advised the Plaintiff that Defendant Evans of GPB Debt holdings was not happy that Plaintiff had reported  to  Heith

Rodman (the SEC Law Firm) that another investor (Aquarius) had combined with GPB to convert debts into equity that were being traded by the Aquarius on behalf of GPB and Aquarius.

50. Plaintiff had opposed the behavior because the intent was to suppress the trading prices, prior to converting debt into equity, manipulating and controlling the stock trading prices and volumes thereby affecting the general uninformed traders which was basically insider trading.

51. Upon terminating Plaintiff, Defendant Cartwright did not offer Plaintiff any free Health Benefit coverage.

52. When 62 year old Caucasian female Jacque Tapley was also terminated, she was offered three (3) months of Health Benefits for free.

53. Mr. Cartwright was aware that Plaintiff was an Insulin dependent Diabetic, with no other medical coverage.

54. Accountant James Clavijo's, first two SEC filings were late causing the company money and efforts.

55. Defendant Guided Therapeutics paid James Clavijo $41,800.00 more than it paid Plaintiff for the same work.

11

56. James Clavijo, was asking Plaintiff work related questions via e-mail on the day that Plaintiff was terminated and replaced by him.

57. The discriminatory termination of Plaintiff that was enforced by Defendant Cartwright and was based on Plaintiff's National Origin, Race, Color and Age. Plaintiff was the only employee of Guided Therapeutics that was terminated as a controller as a condition precedent for the company's acquisition of a loan.

58. Defendant Cartwright has also refused to pay Plaintiff's involuntarily deferred wages of approximately $18, 703.12 (as of 12/31/2016), plus interest and $1,998.78 un-paid vacation benefit of approximately $21,712.32 (as of 12/31/2016), plus interest. (Ex 2 )

59. On March 15, 2017, Guided Therapeutics sent Plaintiff an email acknowledging that Plaintiff was owed $42, 414.21 as of 12/31/2016. (Ex 3).

60. To date Plaintiff has not received any of those funds that are owed to him.

61. On or about May 10, 2016 Plaintiff filed with the EEOC a charge of Race, Age and National Origin discrimination and retaliation for reporting company violations  and unethical acts to the Board of Directors.

12

62. Defendant Cartwright has failed to pay Plaintiff the promised Severance pay (one week's pay for every year worked) of approximately $30,178 (as of 06/30/2017), plus interest even, after the Company has made several hundreds of thousands of dollars.

63. As of June 30, 2017, Plaintiff was owed approximately $78,872 by Defendant Guided Therapeutics.

64. The Defendants have refused to agree to the settlement recommendations of the EEOC investigator

65. Plaintiff has been unable to find employment since his termination from Guided Therapeutics and has lost his house, furniture his family and his car.

66. Plaintiff is now receiving public assistance and has been humiliated by creditors, friends, and family for unpaid debts.

67. Based on information and belief most of the board members of Guided Therapeutics including Defendant Gene Cartwright are millionaires.

68. On March 15, 2017 at 9:24 AM, Plaintiff sent an email to AW at the offices of Guided Therapeutics and asked her about his back pay, unused vacation and severance pay.

13

69. On March 15, 2017 at 10:04 AM, AW from Guided Therapeutics emailed Plaintiff and advised him that he was owed $18, 703.12 in deferred salary and $1, 998.78 in Accrued interest plus $21,712.32 in unpaid vacation, for a total of $42, 414.21 as of 12/31/2016. (Ex 2, Ex 3 )

70. To date, Defendant Guided Therapeutics has forwarded none of those monies to the Plaintiff.

71. In a letter dated July 28, 2016, Defendant Guided Therapeutics through its attorney, advised the EEOC as follows in relevant part " [i]n short, the company was required to terminate the Charging Party's employment as the Controller due to the terms of the SPA. . . ."

72. The Plaintiff has had no relationship with Guided Therapeutics since his termination.

## V. **NOTICE OF RIGHT TO SUE**

73. Plaintiff has received a notice of right to sue from the EEOC hereto attached to the Amended Complaint.

74. The original law suit was commenced within 90 days of the receipt of the Notice of the Right to Sue.

75. Plaintiff's Complaint to the EEOC with exhibits is hereto attached and

includes facts that are incorporated and made part of this First Amended

Complaint. (Ex 4)

## VI. CLAIMS FOR RELIEF

### COUNT ONE

### DISCRIMINATION BASED ON AGE-ADEA

### (Defendant Guided Therapeutics)

76. Plaintiff incorporates by references paragraphs 1-75 as if fully set forth herein.

77. Pursuant to the ADEA it is unlawful to discharge from employment any person

on the ground of age.

78. A Plaintiff may establish a prima facie case of age discrimination by showing

that he was within the protected age group, that he was qualified for the position,

that he experienced adverse employment action, and that such action occurred

under circumstances giving rise to an inference of discrimination. Standard v Abel

Services, Inc., 161 F. 3d 1318, 1329 (1998).

79. Plaintiff was 55 years old and as such was in the protected group.

15

80. Plaintiff was qualified for the position but and was terminated due to his age which violated the ADEA.

81. Upon information and belief, Defendant Guided Therapeutic has a practice of terminating employees based on age.

82. Sixty two (62) year old employee Jacque Tapley was also terminated due to age along with Plaintiff who was 55 year old was terminated.

83. Defendants are subject to the anti discrimination provisions of the ADEA.

84. The subjection of Plaintiff to disparate treatment in the form of termination by defendants in whole or substantial part because of Plaintiff's advanced age was in violation of the ADEA 26 U.S.C. 623 (a)(1)

85. As a direct and proximate result of the violation of Plaintiff's civil rights under the ADEA by the Defendants Guided Therapeutic, Plaintiff has been made to suffer loss of employment, income, benefits and job security.

86. As a direct and proximate result of the violation of Plaintiff's civil rights under the ADEA by Defendants Guided Therapeutic, Plaintiff has been made to suffer mental anguish, pain and suffering, embarrassment and humiliation.

## COUNT TWO
## <u>TITLE VII</u>

## DISCRIMINATION BASED ON NATIONAL ORIGIN

### (Defendant Guided Therapeutics)

87. Plaintiff incorporates by references paragraphs 1-75 as if fully set forth herein.

88. On March 29, 2016 Defendant Cartwright acting on behalf of Guided Therapeutics agreed with Defendant Evans that Plaintiff was not qualified to handle the finances of Guided Therapeutics due to Plaintiff's Nigerian origin and his Nigerian accent.

89. Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1)

90. Defendant Cartwright on behalf of Guided Therapeutics told Plaintiff that Defendant Evans did not want a Nigerian managing GPB's funds which indicated that both GPB and Guided Therapeutics did not find a Nigerian to be a mutually acceptable Controller.

91. The subjection of plaintiff to adverse employment action by defendants due to his national origin is a violation of Title VII.

17

92. As a direct and proximate result of the violation of his civil rights under Title

VII by the Defendants Guided Therapeutic, Plaintiff has been made to suffer loss

of employment, income, benefits and job security.

93. As a direct and proximate result of the violation of Plaintiff's civil rights under

the Title VII by the Defendants Guided Therapeutics, Plaintiff has been made to

suffer mental anguish, pain and suffering, embarrassment and humiliation.

**COUNT THREE**

**TITLE VII**

**DISCRIMINATION BASED ON RACE**

**(Defendant Guided Therapeutics)**

94.  Plaintiff incorporates by references paragraphs 1-75 as if fully set forth herein.

95.  Pursuant to Title VII, it is unlawful for an employer to discriminate against an

employee due to his Race.

96.  Defendant Guided Therapeutics through the action of Defendant Cartwright,

violated Plaintiff's rights under Title VII when he agreed that Plaintiff due to his

race could not be in charge of driving the progress of Guided Therapeutics.

97. The subjection of plaintiff to adverse employment action by defendants due to

his race is a violation of Title VII.

98. As a direct and proximate result of the violation of Plaintiff's civil rights under the Title VII by the Defendant Guided Therapeutics, Plaintiff has been made to suffer loss of employment, income, benefits and job security.

99. As a direct and proximate result of the violation of Plaintiff's civil rights under Title VII by the Defendant Guided Therapeutic, Plaintiff has been made to suffer mental anguish, pain and suffering, embarrassment and humiliation.

**COUNT FOUR**

**TITLE VII**

**DISCRIMINATION BASED ON COLOR**

**(Defendant Guided Therapeutics)**

100.  Plaintiff incorporates by references paragraphs 1-75 as if fully set forth herein.

101. Pursuant to Title VII, it is unlawful for an employer to discriminate against an employee due to his Color.

102. Defendant Guided Therapeutics through the action of Defendant Cartwright, violated Plaintiff's rights under Title VII when he agreed that Plaintiff due to his color could not be in charge of driving the progress of Guided Therapeutics.

103. The subjection of plaintiff to adverse employment action by defendants due to his color is a violation of Title VII.

19

104. As a direct and proximate result of the violation of Plaintiff's civil rights under the Title VII by the Defendant Guided Therapeutics, Plaintiff has been made to suffer loss of employment, income, benefits and job security.

105. As a direct and proximate result of the violation of Plaintiff's civil rights under Title VII by the Defendant Guided Therapeutic, Plaintiff has been made to suffer mental anguish, pain and suffering, embarrassment and humiliation.

## COUNT FIVE

## VIOLATION OF 42 U.S.C § 1981 BY GUIDED THERAPEUTICS AND EACH MEMBER OF ITS BOARD OF DIRECTORS

## DISCRIMINATION BASED ON RACE NATIONAL ORIGIN & COLOR

**(Defendant Guided Therapeutics & each Member of Guided Therapeutics' Board )**

106. Plaintiff incorporates by references paragraphs 1-75 as if fully set forth herein.

107. A Plaintiff may prove a case of discriminatory termination by showing that he was in a protected group, he was removed from his position that he was qualified for, and someone outside of the protected group was given the position. See Standard v. Abel Services, Inc, 161 F. 3d 1318, 1333 (1998).

108. Plaintiff is a dark skinned, African American of Nigerian origin who is qualified for the position of controller.

109. Defendants Guided Therapeutics and each member of its board of directors in their professional and individual role voted in agreement to the SPA evidencing their belief that Plaintiff was not qualified to be director based Race, color and national origin which is in violation of 42 USC § 1981.

110. By their actions defendants Guided Therapeutics and its Board of Directors deprived the Plaintiff of the rights enjoyed by white citizens in the performance, enjoyment, benefits and privileges of his employment in violation of 42 USC § 1981.

111. As a result of the actions of Defendant Cartwright, Defendants Guided Therapeutics, and each member of the Board of Directors, Plaintiff has been made to suffer loss of employment, income, benefits and job security.

112. As a direct and proximate result of the violation of Plaintiff's civil rights under 42 U.S.C § 1981 by Defendant Cartwright, and each member of the board of directors as well Defendant Guided Therapeutic, Plaintiff has been made to suffer mental anguish, pain and suffering, embarrassment and humiliation.

## COUNT SIX
## VIOLATION OF 42 U.S.C. §1981- BY GPB DEBT HOLDINGS AND DEFENDANT EVANS

## DISCRIMINATION BASED ON RACE, NATIONAL ORIGIN & COLOR
## (Defendant Evans and GPB Debt Holdings II LLC)

113. Plaintiff incorporates by references paragraphs 1-75 as if fully set forth herein.

114. 42 USC Section §1981, as amended by the Civil Rights Act of 1991, prohibits private parties from engaging in racial discrimination in the making and enforcing including the performance, modification, and termination – of contracts. 42 U.S.C. § 1981.

115. Plaintiff was the head of a department at Guided Therapeutics and as such was part of the group of contracting individuals.

116. Defendant GPB Debt Holding and Defendant Evans in his individual and professional role, conditioned its contract with Defendant Guided Therapeutics for a $1 Million loan upon the condition precedent that an African American of Nigerian Origin should not be in charge of handling or disbursement of the loan proceeds.

117. By their actions Defendant GPB and Defendant Evans deprived the Plaintiff of the rights enjoyed by white citizens in the performance, enjoyment, benefits and privileges of his employment in violation of 42 USC 1981.

22

118. Plaintiff would have been a beneficiary of the contract but for the discriminatory requirement that Plaintiff had to be removed from Guided Therapeutics based on his African American Race, Nigerian Origin and color.

119. As a result of the actions of Defendant Evans and Defendant GPB Debt Holdings Plaintiff has been made to suffer loss of employment, income, benefits and job security.

120. As a direct and proximate result of the violation of Plaintiff's civil rights under 42 USC §1981 by Defendant Evans and Defendant GPB Debt Holdings Plaintiff has been made to suffer mental anguish, pain and suffering, embarrassment and humiliation.

## COUNT SEVEN
## DODD FRANK 15 U.S.C. § 78u-6(h)(1)(A) (iii)
## SARBANES-OXLEY ACT 18 USC 1514A
## UNLAWFUL REPRISAL
### (Defendant Guided Therapeutics)

121. Plaintiff incorporates by references paragraphs 1-75 as if fully set forth herein.

122. Defendant Guided Therapeutics is a publicly traded company.

23

123. Defendants are subject to the anti-whistleblower provision of DODD FRANK 15 U.S.C. § 78u-6(h)(1)(A) (iii)

124. Subsection (iii) of 15 U.S.C. § 78u-6(h)(1)(A) protects disclosures required or protected by the Sarbanes-Oxley Act of 2002,

125. Subsection (iii) of 15 U.S.C. § 78u-6(h)(1)(A) operates by incorporation; it protects disclosures required or protected by other laws. Unlike the preceding subsections, it applies to disclosures that are completely unrelated to any tip to the SEC

126. Section § 806 of Sarbanes-Oxley protects internal reports, made to any person with supervisory authority over the employee. 18 U.S.C. § 1514(a)(1)(C).

127. Defendants violated FINRA rules and the SEC Sarbanes-Oxley Act by committing acts of reprisal against Plaintiff for providing information regarding conduct which Plaintiff reasonably believed was unlawful price suppression and insider trading that violated the Sarbanes-Oxley Act and DODD FRANK which Plaintiff reported to the Board of Directors, Auditors, and Outside Legal Counsel.

128. The individuals to which plaintiff reported had supervisory authority over Plaintiff and had authority to investigate, to discover and terminate the misconduct.

129. Plaintiff engaged in protected activity by making the report.

24

130. Defendants Cartwright, Defendant Guided Therapeutics and its Board of Directors knew that plaintiff engaged in the protected activity and terminated Plaintiff in reprisal.

131. The steps taken by Defendant Cartwright, Guided Therapeutics and its Board of Directors to terminate plaintiff are sufficient to suggest that Plaintiff's protected activity was the reason for his termination.

132. As a direct and proximate result of the violation of Plaintiff's rights under the DODD FRANK and the Sarbanes-Oxley Act by Defendant Guided Therapeutics, the Plaintiff has been made to suffer loss of employment, income, benefits and job security.

133. As a direct and proximate result of the violation of Plaintiff's rights under the DODD FRANK and the Sarbanes-Oxley Act by Defendants Guided Therapeutics, Plaintiff has been made to suffer mental anguish, pain and suffering, embarrassment and humiliation.

## COUNT EIGHT
## ADEA

### UNLAWFUL RETALIATION
### (Defendant Guided Therapeutics)

134. Plaintiff incorporates by references paragraphs 1-75 as if fully set forth herein.

135. A plaintiff may establish a prima facie case of retaliation under the ADEA by showing a statutorily protected expression, an adverse employment action, and a causal link between the protected expression and the adverse action. Goldsmith v City of Altmore, 996 F.2d 1155, 1163(11 Cir 1993).

136. The conduct that Plaintiff engaged in is protected by the ADEA.

137. Plaintiff engaged in protected activity when he opposed the unlawful conduct of his position being given to the new accountant based on age.

138. Plaintiff engaged in protected activity when he opposed the unlawful conduct of a denial of his earned wages due to his age and the new accountant being paid in advance based on his younger age and was terminated for his opposition.

139. The Defendants Guided Therapeutics conduct in retaliating against Plaintiff for opposing unlawful practices constitute retaliation under the ADEA 29 USC 623 (d).

140. As a direct and proximate result of the violation of Plaintiff's civil rights under the ADEA by the Defendant Guided Therapeutics, Plaintiff has been made to suffer loss of employment, income, benefits and job security.

141. As a direct and proximate result of the violation of Plaintiff's civil rights

under the ADEA by, Defendant Guided Therapeutics, Plaintiff has been made to

suffer mental anguish, pain and suffering, embarrassment and humiliation.

## COUNT NINE
## TITLE VII
## RETALIATION
## (Defendant Guided Therapeutics)

142. Plaintiff incorporates by references paragraphs 1-75 as if fully set forth

herein.

143. A Plaintiff may establish a prima facie case of retaliation by showing that he

engaged in protected opposition to Title VII discrimination, that he was terminated

simultaneously with or subsequent to such opposition and that there was a causal

link between the protected opposition and the termination. Standard v Abel

Services, Inc., 161 F. 3d 1318, 1328 (1998).

144. Plaintiff engaged in protected activity when he opposed the unlawful conduct

of his position being given to the new accountant based on race, national origin and

color.

145. Defendants Guided Therapeutics and it board of directors engaged in

unlawful employment practices when they retaliated against Plaintiff and

27

terminated him for his efforts to oppose discrimination based on race, national

origin and color in violation of Title VII, 42 USC 2000e -et. seq.

146. As a direct and proximate result of the violation of Plaintiff's civil rights

under the Title VII by the Defendant Guided Therapeutics, Plaintiff has been made

to suffer loss of employment, income, benefits and job security.

147. As a direct and proximate result of the violation of Plaintiff's civil rights

under Title VII by the Defendant Guided Therapeutic, Plaintiff has been made to

suffer mental anguish, pain and suffering, embarrassment and humiliation.

## COUNT TEN
## VIOLATION OF 42 U.S.C § 1981 BY GUIDED THERAPY AND EACH MEMBER OF ITS BOARD OF DIRECTORS
### RETALIATION

### (Defendants Guided Therapeutics and each Member of its Board)

148. Plaintiff incorporates by references paragraphs 1-75 as if fully set forth

herein.

149. Defendants Guided Therapeutics and its Board of Directors engaged in

unlawful employment practices when they retaliated against Plaintiff for his efforts

to oppose discrimination based on race, color, and national origin in violation of 42

U.S.C § 1981. Michael C. James, Dr. John F. Imhoff, Dr. Jonathan Niloff and Dr.

Linda Rosenstock and Gene Cartwright all voted in favor the SPA mutually

agreeing that Plaintiff was not qualified to be controller based race, color, and national origin after he opposed discrimination based on said factors.

150. As a direct and proximate result of the violation of Plaintiff's civil rights under the 42 USC § 1981 the Defendant Guided Therapeutics and each member of its Board of Directors, Plaintiff has been made to suffer loss of employment, income, benefits and job security.

151. As a direct and proximate result of the violation of Plaintiff's civil rights under 42 USC § 1981 by the Defendant Guided Therapeutic and each member of Board of Directors, Plaintiff has been made to suffer mental anguish, pain and suffering, embarrassment and humiliation.

## COUNT ELEVEN

## VIOLATIONS OF ECOA, 15 U.S.C. § 1691 and 12 CFR 1002.4  (a)(b) DISCRIMINATION BASED ON RACE

### ( Defendant GPB Debt Holdings and Defendant Evans)

152. Plaintiff incorporates by references paragraphs 1-75 as if fully set forth herein.

153.  Defendants Evans and Defendant GPB Debt Holdings are liable to Plaintiff under the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691, for violations

of Plaintiff's rights under the anti-discrimination and discouragement regulation of 12 CFR 1002.4 (a) (b).

154. The ECOA proscribes discrimination in the extension of credit by making it unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract)

155. 12 CFR 1002.4 (a) prevents a creditor from making any oral or written statement, in advertising or otherwise, to applicants or prospective applicant that would discourage on a prohibited basis a reasonable person from making or pursuing an application.

156. 12 CFR 1002.4 (b) prevents a creditor from making any oral or written statement that would discourage on a prohibited basis a reasonable person from making or pursuing an application.

157. As an employee of Guided Therapeutics, Plaintiff was part of the company and hence was an applicant of the loan that Guided Therapeutics applied for.

158. Defendants Evans and GPB Debt Holdings discriminated against Plaintiff under 12 CFR 1002.4 (a) regarding an aspect of the credit transaction between Guided Therapeutics and GPB Debt Holdings based on Plaintiff's race.

159. Defendants Evans and GPB violated 12 CFR 1002.4 (b) because they conditioned the loan from GBP to Guided Therapeutics on the ground that the loan would be granted if Plaintiff an African American was removed as the controller of Guided Therapeutics.

160. Defendant GPB debt holdings through its agent orally expressed that it did not want a Nigerian managing is funds.

161. Defendants Evans and Defendant GPB Debt Holdings through its agent expressed in writing that Plaintiff can't be in charge of driving this progress

162. As a direct and proximate result of the discriminatory actions of Defendants Evans and GPB Debt Holdings and their violations of the discouragement regulation 12 CFR 1002.4 (a) (b), Plaintiff has been made to suffer loss of employment, income, benefits and job security.

163. As a direct and proximate result of the discriminatory actions of Defendants Evans and Defendant GPB Debt Holdings and their violations of the discouragement regulation 12 CFR 1002. (a) (b), Plaintiff has been made to suffer mental anguish, pain and suffering, embarrassment and humiliation.

## COUNT TWELVE

### VIOLATIONS OF ECOA, 15 U.S.C. § 1691 and 12 CFR 1002.4 (a)(b)

## DISCRIMINATION BASED ON NATIONAL ORIGIN
### ( Defendant GPB Debt Holdings and Defendant Evans)

164. Plaintiff incorporates by references paragraphs 1-75 as if fully set forth herein.

165. 12 CFR 1002.4 (a) provides that a creditor shall not discriminate against an applicant on a prohibited basis regarding any aspect of a credit transaction.

166 As the head of a department at Guided Therapeutics Plaintiff was a co-applicant of the loan from Defendant GPB to Defendant Guided Therapeutics.

167. Defendants GPB Debt Holdings discriminated against Plaintiff under 12 CFR 1002.4 (a) regarding an aspect of the credit transaction between Guided Therapeutics and GPB Debt Holdings based on Plaintiff's National Origin.

168. Defendant GPB violated 12 CFR 1002.4 (b) because it conditioned its loan to Guided Therapeutics on the ground that Plaintiff an African American of National Origin not be the controller to handle said funds and as such engaged in discouragement based on National Origin.

169. As a direct and proximate result of the discriminatory actions of Defendants

Evans and Defendant GPB Debt Holdings and their violations of the

discouragement regulation 12 CFR 1002.4 (a) (b), Plaintiff has been made to suffer

loss of employment, income, benefits and job security.

170. As a direct and proximate result of the discriminatory actions of Defendants

Evans and Defendant GPB Debt Holdings and their violations of the

discouragement regulation 12 CFR § 1002. (a) (b), Plaintiff has been made to

suffer mental anguish, pain and suffering, embarrassment and humiliation.

## COUNT THIRTEEN
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
### ( Defendant GPB Debt Holdings and Defendant Evans)

171. Plaintiff incorporates by references paragraphs 1-75 as if fully set forth herein

172. Defendant Evans acting on behalf of GPB Debt Holdings II LLC, unlawfully

interfered with Plaintiff's relationship with Guided Therapeutics.

173. Defendant GPB Debt Holdings acted improperly and without privilege.

174. Defendant Evans on behalf of GPB, acted purposely with malice and with the

intent to injure when it induced Guided Therapeutics not to continue its business

relationship with the plaintiff.

175. Defendant Evans as CEO of GDP, upon loaning $1 Million dollars to Guided Therapeutics, imposed a condition precedent that Plaintiff due to his color, race and Nigerian origin should be replaced as the Accountant for Guided Therapeutics.

176. Defendant GPB Debt Holdings II LLC through its CEO Evans, instilled into Guided Therapeutic its unlawful racist views that a back skinned Nigerian with a coarse accent could not be in Charge of Guided Therapeutics' success.

177. Guided Therapeutics agreed with GPB Debt Holdings II LLC and its CEO Evans and internalized and adopted the racist sentiment and terminated Plaintiff, due to his Age, Race, Color and National Origin.

178. Defendants GPB Debt Holdings II LLC and Evans acted with malice and reckless indifference.

179. Defendant GPB Debt Holdings and Defendant Evans had no privilege to act in said manner.

180. As a direct and proximate result of the discriminatory actions of Defendants Evans and Defendant GPB Debt Holdings, Plaintiff has been made to suffer loss of employment, income, benefits and job security.

34

181. As a direct and proximate result of the discriminatory actions of Defendant Evans and Defendant GPB Debt Holdings, Plaintiff has been made to suffer mental anguish, pain and suffering, embarrassment and humiliation.

## COUNT FOURTEEN
## VIOLATION OF GEORGIA LABOR LAW  OCGA §34-7-2

### (Defendant Guided Therapeutics)

182. Plaintiff incorporates by references paragraphs 1-75 as if fully set forth herein.

183. Defendants willfully violated the terms of OCGA § 34-7-2.

184. The OCGA § 34-7-2 provides that:

> Every person, firm, or corporation, . . . shall make wage and salary payments to such employees or to their authorized representatives (1) by lawful money of the United States, (2) by check, or (3) with the consent of the employee, by authorization of credit transfer to his account with a bank, trust company, or other financial institution authorized by the United States or one of the several states to receive deposits in the United States. Such payments shall be made on such dates during the month as may be decided upon by such person, firm, or corporation; provided, however, that the dates so selected shall be such that the month will be divided into at least two equal periods; and provided, further, that the payments made on each such date shall in every case correspond to the full net amount of wages or earnings due the employees for the period for which the payment is made.

185. Defendant Guided Therapeutics violated OCGA § 34-7-2 said defendants failed to pay Plaintiff three months earned wages prior to his termination.

186. As a direct and proximate result of actions Defendants Guided Therapeutics Plaintiff has been made to suffer loss of income.

187. As a direct and proximate result of the discriminatory actions of Defendant Guided Therapeutics Plaintiff has been made to suffer mental anguish, pain and suffering, embarrassment and humiliation due to failure to meet his financial obligation.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in favor of Plaintiff and against Defendants:

A. Declaring that the Defendant Guided Therapeutics has violated Plaintiff's rights under Title VII of the Civil Rights Acts of 1964 (as amended) 42 U.S.C § 2000e, et. seq

B. Declaring that the Defendant Guided Therapeutics has violated Plaintiff's rights under the Federal Age Discrimination in Employment Act of 1967 as Amended, 29 U.S.C § 621 et. seq (ADEA).

C. Declaring that the Defendant Guided Therapeutics has violated Plaintiff's rights under the Dodd Frank 15 U.S.C. § 78u-6(h)(1)(A) (iii) anti-retaliation provision and the Sarbanes -Oxley Act 18 U.S.C §1514A.

36

D. Declaring that Defendant Guided Therapeutics has violated and Georgia labor Law OCGA §34-7-2.

E. Declaring that all Defendants have violated Plaintiff's rights under 42 USC §1981.

F. Declaring that the Defendants GPB Debt Holdings and Defendant Evans have violated plaintiff's rights under the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691, for violations of the discrimination and discouragement regulation   12 CFR 1002.4 (a) (b).

G. Declaring that GPB Debt Holdings II LLC and its CEO Evans tortuously interfered with Plaintiff's economic advantage.

H. That the Court order Defendants to reinstate Plaintiff's employment.

I. That the Court grant full front pay to the Plaintiff;

J. That the Court grant full back pay to the Plaintiff;

K. That the Court grant compensatory and punitive damages apportioned jointly and severally among the defendants;

L. That the Court grant Plaintiff compensatory damages for humiliation; emotional distress and other damages caused by defendant's conduct;

M. That the court grant Plaintiff punitive damages for defendants' malicious and reckless indifferent conduct;

N. That the court grant Plaintiff all employment benefits he would have enjoyed had he not been discriminated and retaliated against;

O.  That the court grant Plaintiff expenses for litigation, including reasonable attorney's fees;

P. That the Court grant Plaintiff a trial by jury;

Q. That the Court grant Plaintiff all other relief that the Court deems appropriate.

Respectfully submitted

Charles Rufai, Pro Se
364 11th Street
Newark, NJ 07103
Phone:  (678) 983 9027
Charlesrufai@aol.com

38

# EXHIBIT 1

EXTRACT OF THE SPA

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

**FORM 8-K**

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): October 9, 2015

**GUIDED THERAPEUTICS, INC.**
(Exact name of registrant as specified in its charter)

| **Delaware** | **0-22179** | **58-2029543** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **5835 Peachtree Corners East, Suite D** **Norcross, Georgia** | **30092** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(770) 242-8723**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ]  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ]  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ]  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ]  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

1

**Item      Entry Into a Material Definitive Agreement**
**1.01**

*Amendment #6*
On January 20, 2016, Guided Therapeutics, Inc. (the "Company") entered into an amendment agreement with Tonaquint, Inc. ("Amendment #6"), in order to clarify the effects of a stock dividend, stock split, or reclassification of the Company's common stock on the terms of the secured promissory note issued to Tonaquint on September 10, 2014. Pursuant to the terms of the Tonaquint note as amended by Amendment #6, in the event of any of these corporate actions, the "Conversion Price" and the "Conversion Floor" (each as defined in the Tonaquint note) will automatically be equitably adjusted for any stock dividends, stock splits, or stock reclassifications by the Company. On November 11, 2015, the Company's stockholders granted authority to the Company's board of directors to effect a reverse stock split at any time prior to November 11, 2018, in a ratio ranging from 1-for-10 to 1-for-100, of all issued and outstanding shares of the Company's common stock.

The description of Amendment #6 does not purport to be complete and is qualified in its entirety by the full text of Amendment #6, attached as Exhibit 10.1 and incorporated herein by reference.

*Amendment #7*
On February 11, 2016, the Company consented to an assignment of the Tonaquint note by Tonaquint to GPB Debt Holdings II, LLC ("GPB") and Aquarius Opportunity Fund LP ("Aquarius"). In connection with the assignment, the Company, GPB and Aquarius entered an amendment agreement with the Company, dated February 11, 2016 ("Amendment #7"), pursuant to which GPB and Aquarius waived an ongoing event of default under the Tonaquint note. Pursuant to the Tonaquint note prior to Amendment #7, there was an event of default anytime the Company's market capitalization fell below $7.5 million or the closing trade price of the Company's common stock fell below $0.05. The closing price of the Company's common stock first closed below $0.05 on October 9, 2015. Upon an event of default (unless waived), all outstanding unpaid principal, plus all accrued interest and other amounts due under the Tonaquint note automatically become immediately due and payable at the "Mandatory Default Amount" (115% of the outstanding balance, plus all interest, fees and charges). Further, under the related security agreement, upon an event of default (unless waived), GPB and Aquarius can assert their rights related to the collateral securing the Tonaquint note (the Company's accounts receivables and inventory).

Under terms of Amendment #7, GPB and Aquarius retroactively waived the above-described event of default (including all resulting remedies available to them under the Tonaquint note and the related security agreement). In addition, Amendment #7 amends the Tonaquint note to eliminate the market capitalization requirement going forward.

The description of Amendment #7 does not purport to be complete and is qualified in its entirety by the full text of Amendment #7, attached as Exhibit 10.2 and incorporated herein by reference.

*Notes Financing*
On February 11, 2016, the Company entered into a securities purchase agreement with GPB for the issuance and sale on February 12, 2016 to GPB of $1.4375 million in aggregate principal amount of a senior secured convertible note for an aggregate purchase price of $1.15 million (a 20% original issue discount). In addition, GPB received a warrant exercisable to purchase an aggregate of approximately 179.7 million shares of the Company's common stock.

The convertible note matures on the second anniversary of issuance and, in addition to the 20% original issue discount, accrues interest at a rate of 17% per year. The Company will pay monthly interest coupons and, beginning six months after issuance, will pay amortized quarterly principal payments. If the Company does not receive, on or before the first anniversary after issuance, an aggregate of at least $3.0 million from future equity or debt financings or non-dilutive grants, then GPB will have the option of accelerating the maturity date to the first anniversary of issuance. The Company may prepay the convertible note, in whole or in part, without penalty, upon 20 days' prior written notice.

2

Subject to resale restrictions under Federal securities laws and the availability of sufficient authorized but unissued shares of the Company's common stock, the convertible note is convertible at any time, in whole or in part, at the holder's option, into shares of the Company's common stock, at a conversion price equal to the lesser of $0.008 per share or 70% of the average closing price per share for the five trading days prior to issuance, subject to certain customary adjustments and anti-dilution provisions contained in the convertible note.

The convertible note includes customary event of default provisions and a default interest rate of the lesser of 19% or the maximum amount permitted by law. Upon the occurrence of an event of default, GPB may require the Company to redeem the convertible note at 120% of the outstanding principal balance. The convertible note is secured by a lien on all of the Company's assets, including its intellectual property, pursuant to a security agreement entered into by the Company and GPB in connection with the transaction.

Pursuant to the purchase agreement, GPB may not engage in any "short sale" transactions in the Company's common stock. The Company has agreed to register for resale the shares of common stock issuable upon conversion of the convertible note and exercise of the warrant.

The warrant is exercisable at any time, pending availability of sufficient authorized but unissued shares of the Company's common stock, at an exercise price per share equal to the conversion price of the convertible note, subject to certain customary adjustments and anti-dilution provisions contained in the warrant. The warrant has a five-year term.

The purchase agreement contains customary representations, warranties and covenants by, among and for the benefit of the parties. The purchase agreement also provides for customary indemnification of GPB by the Company.

The Company used a placement agent in connection with the transaction. For its services, the placement agent received a cash placement fee equal to 4% of the aggregate gross proceeds from the transaction and a warrant to purchase shares of common stock equal to an aggregate of 6% of the total number of shares underlying the securities sold in the transaction, at an exercise price equal to, and terms otherwise identical to, the warrant issued to GPB. Finally, the Company agreed to reimburse the placement agent for its reasonable out-of-pocket expenses.

In connection with the transaction, on February 12, 2016, the Company and GPB entered into a four-year consulting agreement, pursuant to which GPB will provide management consulting services to the Company in exchange for a royalty payment, payable quarterly, equal to 3.5% of the Company's revenues from the sale of products.

Also in connection with the transaction, on February 10, 2016, the Company and the holder of a majority of its Series C Convertible Preferred Stock agreed to amend the Series C stock purchase agreement to eliminate any participation rights held by the Series C shareholders with respect to the transaction.

The issuance of the convertible note and warrant under the purchase agreement was exempt from the registration requirements of the Securities Act, pursuant to the exemption for transactions by an issuer not involving any public offering under Section 4(a)(2) of the Securities Act of 1933. In making this determination, the Company relied on the representations of GPB in the purchase agreement that it is an "accredited investor" and had access to information about its investment and about the Company.

The descriptions of the of the purchase agreement, the convertible note, the security agreement, the warrant, the consulting agreement, and the Series C amendment agreement do not purport to be complete and are qualified in their entirety by the full text of each, attached as Exhibits 10.3, 4.1, 10.4, 10.5, 10.6, and 10.7, respectively, and incorporated herein by reference.

This current report on Form 8-K is neither an offer to sell nor the solicitation of an offer to buy any securities. The securities described above have not been registered under the Securities Act and may not be offered or sold in the United States absent registration or an exemption from registration under the Securities Act.

**Item    Creation of Direct Financial Obligation or an Obligation Under an Off-Balance Sheet Arrangement of a Registrant**
**2.03**

The information set forth under the caption "Notes Financing" in Item 1.01 is incorporated herein by reference.

**Item 2.04**    **Triggering Events That Accelerate or Increase a Direct Financial Obligation under an Off-Balance Sheet Arrangement**

The information set forth under the caption "Amendment #7" in Item 1.01 is incorporated herein by reference.

**Item 3.02**    **Unregistered Sale of Equity Securities**

The information set forth under the caption "Notes Financing" in Item 1.01 is incorporated herein by reference.

**Item 5.02**    **Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers**

On December 11, 2015, Ronald Hart, age 73, formally announced his decision to retire from the board of directors of the Company, effective immediately. Dr. Hart was appointed to the board in 2007. His decision to resign was for personal reasons and was not a result of any disagreement with the Company on any matter relating to the Company's operations, policies or practices.

**Item 9.01**    **Financial Statements and Exhibits**

       (d)      *Exhibits.*

| Number | Exhibit |
|--------|---------|
| 4.1 | Convertible Note |
| 10.1 | Amendment #6 (Tonaquint Note) |
| 10.2 | Amendment #7 (Tonaquint Note) |
| 10.3 | Purchase Agreement (Convertible Note) |
| 10.4 | Security Agreement (Convertible Note) |
| 10.5 | Warrant (Convertible Note) |
| 10.6 | Consulting Agreement |
| 10.7 | Amendment Agreement (Series C) |

4

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

GUIDED THERAPEUTICS, INC.

/s/ Gene S. Cartwright

By: Gene S. Cartwright, Ph.D.
President and Chief Executive Officer

Date: February 12, 2016

5

**EXHIBIT INDEX**

| Number | Exhibit |
|--------|---------|
| 4.1 | Convertible Note |
| 10.1 | Amendment #6 (Tonaquint Note) |
| 10.2 | Amendment #7 (Tonaquint Note) |
| 10.3 | Purchase Agreement (Convertible Note) |
| 10.4 | Security Agreement (Convertible Note) |
| 10.5 | Warrant (Convertible Note) |
| 10.6 | Consulting Agreement |
| 10.7 | Amendment Agreement (Series C) |

6

**SECURITIES PURCHASE AGREEMENT**

This Securities Purchase Agreement (this "Agreement") is dated as of February 11, 2016, between Guided Therapeutics, Inc., a Delaware corporation (the "Company"), and each purchaser identified on the signature pages hereto (each, including its successors and assigns, a "Purchaser" and collectively the "Purchasers").

WHEREAS, subject to the terms and conditions set forth in this Agreement and pursuant to an exemption from the registration requirements of Section 5 of the Securities Act contained in Section 4(a)(2) thereof and/or Rule 506(b) thereunder, the Company desires to issue and sell to each Purchaser, and each Purchaser, severally and not jointly, desires to purchase from the Company, securities of the Company as more fully described in this Agreement.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, the Company and each Purchaser agree as follows:

## ARTICLE I.
### DEFINITIONS

1.1 Definitions. In addition to the words and terms defined elsewhere in this Agreement, for all purposes of this Agreement, the following terms have the meanings set forth in this Section 1.1:

"Acquiring Person" shall have the meaning ascribed to such term in Section 4.7.

"Action" shall have the meaning ascribed to such term in Section 3.1(j).

"Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person as such terms are used in and construed under Rule 405 under the Securities Act.

"Board of Directors" means the board of directors of the Company.

"Business Day" means any day except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"Closing Date" means any Trading Day after all of the Transaction Documents have been executed and delivered by the applicable parties thereto, and all conditions precedent to (i) the Purchasers' obligations to pay the portion of the Subscription Amount due at such Closing Date and (ii) the Company's obligations to deliver the Securities to be issued and sold at such Closing Date, in each case, have been satisfied or waived, or such other date that the parties agree upon.

"Common Stock" means the common stock of the Company, par value $0.001 per share, and any other class of securities into which such securities may hereafter be reclassified or changed.

"Common Stock Equivalents" means any securities of the Company or the Subsidiaries which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, any debt, preferred stock, right, option, warrant or other instrument that is at any time convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock.

"Company Counsel" means Jones Day.

"Consulting Agreement" means the consulting agreement, in substantially the form of Exhibit D.

"Conversion Price" shall have the meaning set forth in the Notes.

"Deposit Account Control Agreement" means an agreement in writing, in form and substance satisfactory to the Lead Investor and the Company, by and among Lead Investor, the Company and any bank at which any deposit account of the Company is at any time maintained which provides that, upon and during the continuation of an Event of Default (as defined in the Notes), such bank will comply with instructions originated by the Lead Investor directing disposition of the funds in the deposit account without further consent by Company and such other terms and conditions as the Lead Investor may require.

"DTC" means the Depositary Trust Company.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Exempt Issuance" means the issuance of (a) securities to employees, officers or directors of, or consultants to, the Company, pursuant to any stock or option plan duly adopted for such purpose, or upon approval by a majority of the non-employee members of the Board of Directors or a majority of the members of a committee of non-employee directors established for such purpose for services rendered to the Company, (b) securities upon the exercise or exchange of or conversion of any Securities issued hereunder, and/or other Common Stock

additional legal opinions, other information or instructions to convert or exercise their Notes or exercise their Warrants. Without limiting the preceding sentences, no ink-original Conversion Notice or Notice of Exercise shall be required, nor shall any medallion guarantee (or other type of guarantee or notarization) of any Conversion Notice or Notice of Exercise form be required in order to convert the Notes or exercise the Warrants. The Company shall honor conversions of the Notes and exercises of the Warrants and shall deliver Shares and Warrant Shares in accordance with the terms, conditions and time periods set forth in the Transaction Documents.

4.19 [redacted text]

4.20 Maintenance of Property . The Company shall use its commercially reasonable efforts to keep all of its property, which is necessary or useful to the conduct of its business, in good working order and condition, ordinary wear and tear excepted.

4.21 Preservation of Corporate Existence . The Company shall preserve and maintain its corporate existence, rights, privileges and franchises in the jurisdiction of its incorporation, and qualify and remain qualified, as a foreign corporation in each jurisdiction in which such qualification is necessary in view of its business or operations and where the failure to qualify or remain qualified might reasonably have a Material Adverse Effect.

4.22 No Short Sales . No Purchaser shall, nor shall it permit its Affiliates or any Person managed or controlled by the Purchaser (collectively, the "Restricted Persons") shall, directly or indirectly, engage in any Short Sales involving the Company's securities. Notwithstanding the foregoing, nothing contained herein shall prohibit any Restricted Person from: (a) selling "long" (as defined under Rule 200 promulgated under Regulation SHO of the Securities Act; or (b) selling a number of shares of Common Stock equal to the number of Shares that such Restricted Person is entitled to receive under a pending Note conversion or Warrant exercise but has not yet taken possession of so long as such Restricted Person delivers the Shares or Warrant Shares (as the case may be) to the purchaser thereof; provided, however, such Restricted Person shall not be required to so deliver any such Shares or Warrant Shares if the Company fails for any reason to deliver such Shares or Warrant Shares to the Purchaser on the applicable settlement date upon the terms and subject to the provisions of the Notes or Warrant, as the case may be.

4.23 Increase in Reservation of Shares . Each Purchaser acknowledges that, as of the date of this Agreement, the Company does not have sufficient authorized shares of Common Stock available for issuance upon conversion of all of the Notes or exercise of all of the Warrants issued pursuant to this Agreement and, therefore, any attempts at conversion of the Notes or exercise of the Warrants will be contingent upon availability of sufficient shares of Common Stock at the time of any particular conversion or exercise, as applicable. Accordingly, and notwithstanding anything to the contrary in the Transaction Documents, the Purchasers shall not submit any Notice of Conversion (as defined in the Notes) or any Notice of Exercise (as defined in the Warrants) from the date hereof until the earlier of (a) six months from the date hereof (b) the date of an effective amendment to the Company's certificate of incorporation providing for either a reverse stock split or additional authorized shares, in either case sufficient such that the Company does have sufficient authored shares available for issuance upon conversion of all of the Notes or exercise of all of the Warrants issued pursuant to this Agreement (such amendment, the "Charter Amendment"). The Company shall use its commercially reasonable efforts (subject to its fiduciary obligations under applicable law) to obtain the necessary regulatory approvals and/or stockholder approval required to file the Charter Amendment, and shall file the Charter Amendment with the Secretary of State of the State of Delaware as soon as practicable after obtaining the applicable approvals. Until the earlier of (i) the effectiveness of the Charter Amendment or (ii) six months from the date hereof, the Company shall be deemed to be incompliance with all covenants in the Transaction Documents, and not in breach of any representations or warranties in the Transaction Documents, regarding the sufficiency of authorized and reserved shares of Common Stock issuable upon conversion of the Notes or exercise of the Warrants, including, but not limited to, Sections 3.1(f) and 4.11, Section 4(c)(vi) of the Notes, and Section 5(d) of the Warrants.

## ARTICLE V.
### MISCELLANEOUS

5.1 Termination . This Agreement may be terminated by any Purchaser, as to such Purchaser's obligations hereunder only and without any effect whatsoever on the obligations between the Company and the other Purchasers, by written notice to the other parties, if the Closing Date has not been consummated on or before February 28, 2016.

5.2 Fees and Expenses. Except as expressly set forth below and in the Transaction Documents to the contrary, each party shall pay the fees and expenses of its advisers, counsel, accountants and other experts, if any, and all other expenses incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement. The Company shall pay all Transfer Agent fees (including, without limitation, any fees required for same-day processing of any instruction letter delivered by the Company and any exercise notice delivered by a Purchaser), stamp taxes and other taxes and duties levied in connection with the delivery of any Securities to the Purchasers. The Company agrees to pay counsel for the Lead Investor $25,000 ($5,000 of which has been paid in advance) in fees together with reasonable costs including those necessary to provide the Purchasers with a lien on all of the assets of the Company. From the Lead Investor's Subscription Amount, the Lead Investor may withhold up to $20,000 in order to pay the fees due its counsel as well as any costs incurred by such counsel provided that written notice is given to the Company. From the proceeds of the Subscription Amount, the Lead Investor shall withhold $50,000 and pay such amount directly to Company Counsel on behalf of the Company, in immediately available funds in accordance with wire instructions provided in advance.

becoming or being declared due and payable prior to the date on which it would otherwise become due and payable and such default is not cured within ten Trading Days;

(vii) the Common Stock shall not be eligible for listing or quotation for trading on its Trading Market for a period longer than 10 Trading Days;

(viii) the Company shall have consummated a Change of Control Transaction or/Fundamental Transaction without the Lead Investors consent without paying in full all amounts owed under the Note at or prior to such consummation; (ix) a final judgment for the payment of money aggregating in excess of $50,000 is rendered against the Company and/or any of its Subsidiaries and which judgment is not, within 45 days after the entry thereof, bonded, discharged or stayed pending appeal, or is not discharged within 60 days after the expiration of such stay; provided, however, any judgment that is covered by insurance or an indemnity from a credit-worthy party will not be included in calculating the amount of the judgment so long as the Company provides the Holder a written statement from such insurer or indemnity provider (which written statement shall be reasonably satisfactory to the Holder) to the effect that such judgment is covered by insurance or an indemnity and the Company or such Subsidiary (as the case may be) will receive the proceeds of such insurance or indemnity within 30 days of the issuance of such judgment.

(x) the Company shall provide at any time notice to the Holder, including by way of public announcement, of the Company's intention to not honor requests for conversions of any Notes in accordance with the terms hereof.

(xi) the Company materially deviates from the Operating Budget; or

(xii) the Company fails to employ the final disbursement as set forth as provided for in Section 4(c)(i)

(b) Remedies Upon Event of Default . If any Event of Default occurs, the outstanding principal amount of this Note, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and payable in cash at the Mandatory Default Amount. Upon the payment in full of the Mandatory Default Amount, the Holder shall promptly surrender this Note to or as directed by the Company. In connection with such acceleration described herein, the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable Law. Such acceleration may be rescinded and annulled by Holder at any time prior to payment hereunder and the Holder shall have all rights as a holder of the Note until such time, if any, as the Holder receives full payment pursuant to this Section 7(b). No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon.

(c) Interest Rate Upon Event of Default . Commencing on the occurrence of any Event of Default and until such Event of Default is cured, this Note shall accrue interest at an interest rate equal to the Default Interest Rate.

(d) Conversion Price Upon Event of Default . Commencing on the occurrence of any Event of Default, all amounts due under the Note shall be increased by 20%.

Section 8 . Miscellaneous .

(a) No Rights as Stockholder Until Conversion . This Note does not entitle the Holder to any voting rights, dividends or other rights as a stockholder of the Company prior to the conversion hereof other than as explicitly set forth in Section 4.

(b) Notices . All notices, offers, acceptance and any other acts under this Agreement (except payment) shall be in writing, and shall be sufficiently given if delivered to the addressees in person, by Federal Express or similar receipted next business day delivery, as follows:

If to the Company: Guided Therapeutics Inc.
5835 Peachtree Corners East, Suite D
Norcross, GA 30092
Telephone No.: (770) 242-8723
Facsimile No.: (770) 242-8639
Attention: President
E-mail: president@guidedinc.com

with a copy to: Jones Day
1420 Peachtree St. NE, Suite 800
Atlanta, Georgia 30309
Telephone No.: (404) 581-3939
Facsimile No.: (404) 581-8330
Attention: Heith D. Rodman
E-mail: hdrodman@jonesday.com
f to Holder: Address on signature page

*Signature Page to Amendment to Securities Purchase Agreement*

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first above written.

**COMPANY:**

**GUIDED THERAPEUTICS, INC.**

By: /s/ Gene S. Cartwright
    Gene S. Cartwright
    President and Chief Executive Officer

# EXHIBIT 2

.From: Gene Cartwright <gcartwright@guidedinc.com>
   To: charlesrufai <charlesrufai@aol.com>
Subject: I will follow up
   Date: Tue, Mar 29, 2016 11:52 am

Charles,

Here is the information that I still owe you.


You remain our distributor for Nigeria

I will confirm the severance that we will pay

I will confirm the back pay

I will write a letter explaining why you were let go, which obviously has nothing to do with your performance.


Gene

# EXHIBIT 3

**From:** Aleksandra Waterstreet <awaterstreet@guidedinc.com>
   **To:** Charles Rufai <charlesrufai@aol.com>
   **Cc:** Gene Cartwright <gcartwright@guidedinc.com>; Mark Faupel <mfaupel@guidedinc.com>
**Subject:** RE: Guided Therapeutics, Inc. Officer Confirmation
   **Date:** Wed, Mar 15, 2017 10:04 am

Good morning Charles,

Hope you are doing well.
Below are the balances you requested.

| Charles Rufai | | |
|---|---|---|
| Deferred Salary | 18,703.12 | |
| Accrued Interest | 1,998.78 | |
| | | 20,701.89 |
| Accrued vacation | | 21,712.32 |
| **TOTAL for Charles Rufai:** | | **42,414.21** |

Thank you,
Ola


**From:** Charles Rufai [mailto:charlesrufai@aol.com]
**Sent:** Wednesday, March 15, 2017 9:24 AM
**To:** Aleksandra Waterstreet
**Cc:** Gene Cartwright; Mark Faupel
**Subject:** Fwd: Guided Therapeutics, Inc. Officer Confirmation

Ola,

Good day and hope all is well.

In other not to delay the on-going audit process, could you please assist me with this Audit Request, 2nd attempt?

To include:

- My back pay, plus accrued interest
- My unused vacation
- My severance pay - Gene had suggested a week's pay for every year served (8.5 years)

Kind Regards,
Charles

-----Original Message-----
From: Durie, Christina <CDurie@uhy-us.com>
To: charlesrufai <charlesrufai@aol.com>
Cc: Stuart, Jesse <JStuart@uhy-us.com>
Sent: Sun, Mar 12, 2017 10:37 pm
Subject: FW: Guided Therapeutics, Inc. Officer Confirmation

Hello,

. I am emailing you to follow up regarding the confirmation for Guided Therapeutics 2016 audit. Please complete the attached confirmation and return at your earliest convenience. Your assistance is greatly appreciated.

Thank you,

Christina Durie
Staff Accountant, UHY LLP
12900 Hall Road, Suite 500, Sterling Heights, MI 48313
O: 586 254 1040 | F: 586 254 1805 | cdurie@uhy-us.com | www.uhy-us.com



**From:** Durie, Christina
**Sent:** Monday, February 27, 2017 2:13 PM
**To:** 'charlesrufai@aol.com' <charlesrufai@aol.com>
**Cc:** Stuart, Jesse <jstuart@uhy-us.com>
**Subject:** Guided Therapeutics, Inc. Officer Confirmation

Hello,

I am emailing from UHY LLP, Certified Public Accountants on behalf of the 2016 audit of Guided Therapeutics, Inc. Please find the confirmation attached, containing authorized signature from Mark Faupel, COO of Guided Therapeutics, Inc. We ask that you kindly complete the confirmation and return as soon as possible.

If you have any questions, please do not hesitate to reach out.

Thank you,

Christina Durie
Staff Accountant, UHY LLP
12900 Hall Road, Suite 500, Sterling Heights, MI 48313
O: 586 254 1040 | F: 586 254 1805 | cdurie@uhy-us.com | www.uhy-us.com



Important Notices:

This electronic mail message and any accompanying documents may contain information that is proprietary, privileged, confidential and/or exempt from disclosure under applicable law. If you are not an intended recipient, please immediately notify the sender and delete the original message and any accompanying documents.

UHY Advisors, Inc. provides tax and business consulting services through wholly owned subsidiary entities that operate under the name of "UHY Advisors." UHY Advisors, Inc. and its subsidiary entities are not licensed CPA firms. UHY LLP is a licensed independent CPA firm that performs attest services in an alternative practice structure with UHY Advisors, Inc. and its subsidiary entities. UHY Advisors, Inc. and UHY LLP are U.S. members of Urbach Hacker Young International Limited, a UK company, and form part of the international UHY network of legally independent accounting and consulting firms. "UHY" is the brand name for the UHY International network. Any services described herein are provided by UHY Advisors and/or UHY LLP (as the case may be) and not by UHY or any other member firm of UHY. Neither UHY nor any member of UHY has any liability for services provided by other members.

# EEOC FILING

# WITH ATTACHMENTS

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 410-2016-03801 |
| | | and EEOC |

State or local Agency, if any

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Mr. Charles Rufai** | **(678) 983-9027** | **02-28-1961** |

| Street Address | City, State and ZIP Code |
|---|---|
| **2824 Legislative Ln, Buford, GA 30519** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **GUIDED THERAPEUTICS** | **15 - 100** | **(770) 242-8723** |

| Street Address | City, State and ZIP Code |
|---|---|
| **5835 Peachtree Corners E, Suite D, Norcross, GA 30092** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☒ NATIONAL ORIGIN

☐ RETALIATION  ☒ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION

☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: **03-29-2016**   Latest: **03-29-2016**

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

**I began working for the above named employer on June 11, 2007, as a Controller. On March 29, 2016, I was discharged.**

**I believe that I have been discriminated against due to my age (55), in violation of the Age Discrimination in Employment Act of 1967, as amended, my race (African-American) and national origin (Nigerian), in violation of Title VII of the Civil Rights Act of 1964, as amended.**

RECEIVED

MAY 1 0 2016

EEOC-ATDO

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **May 10, 2016**          *[signature]*<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

Mr. Stephen T. Weber – via email
Supervisory Investigator
EEOC – Atlanta District Office
100 Alabama Street, S.W.
Site 4R30
Atlanta, GA 30303
June 6, 2018

Charles Rufai
2824 Legislative Lane
Buford, GA 30519

### Re: Charles Rufai vs. Guided Therapeutics, Inc.
### EEOC Charge No. 410-2016-03801

Dear Mr. Weber:

It should be noted that I filed an initial EEOC charge on March 29th, 2016 with Mr. Thomas Roe and was assigned a reference number **EEOC 410-2016-03109**.

On the same day, I received an email from Mr. Gene Cartwright, President and CEO of Guided Therapeutics, Inc. ("Gene") - See Exhibit No. 3. Based on the contents of the email, I called and sent an email to Mr. Roe on Friday, April 1st to hold off on the filing. I was hoping to hear back from Gene, as stated in his email. Clearly, I was just looking for an equitable and fair separation.

On May 20th, 2016, after waiting for six weeks without hearing from Gene, I went back to the EEOC office to continue with the charges. I was assigned to Ms. Sharon Robertson. Ms. Robertson indicated that I have to start the filing all over. Hence a new reference No. 410-2016-03801 dated May 20th, 2016 was assigned.

On January 12th, 2017, after waiting for 9 months to hear from EEOC, I sent an email to Ms. Sharon Robertson asking for the updates. On the same day, Ms. Sharon Robertson responded via an email, with 2 attachments (see attached). The first attachment was from Guided Therapeutics' attorney (Freeman Mathis & Gray), dated July 28, 2016 and the 2nd attachments was an EEOC notification of the Company's response "The Response", with 20 days for me to respond.

Based on these facts, it is very disturbing that The Company's response was sent to the EEOC office on July 28, 2016 or thereabout and was not forwarded to me earlier, despite my contact with the Agency on three different occasions on August 15th, September 22nd and October 27th, 2016.

As a result of this delay, I prayed that i have not missed deadlines in filing other charges, especially charges with OSHA and SEC Whistle Blower.

In response to my former Company's denial in their letter of July 28, 2016, enclosed are my responses to the Company's positions?

Firstly, I will like to state clearly that my Rights and obligation, as an Employee is separate and distinct from my Rights and Obligations, as a Partner in a Distributorship Agreement with and for the Company's Product. Hence, my responses will be limited to my Rights and Obligations as an Employee, only.

### FACTS STATED AT MY CHARGE IN-TAKE THAT NEEDS TO BE ADDRESSED:

1. On March, 29th 2016 the termination date, I was referred to by name and nationality, "Evans, does not want you Charles a Nigerian managing their funds" Gene Cartwright ("Gene") made the statement in my office, **clearly indicating a biased against my Race and Nationality.**

2. Gene also indicated that Evans was concerned about my complaints on another investor, Aquarius Opportunity Funds ("Aquarius"), combining with GPB to convert debts into equity and being traded by Aquarius on behalf of both GPB and Aquarius. **The intent was to suppress the trading prices, prior to converting debt into equity, manipulating and controlling the Stock Trading prices and volume, thereby affecting the general un-informed stock traders. This action was frowned at by Mr. Heith Rodman of the law firm of Jones Day (the Company's SEC Law Firm).**

3. I did ask Gene if he was terminating me because I was always complaining to him that he always telling GPB and Aquarius too much Company details prior to financing? **The level of conversation between Gene and both GPB and Aquarius were excessive, especially where the Company had a paid Broker to facilitate the deals.** He replied that his wife always complains about that too.

4. I also asked Gene if he was letting me go because of my email to the Board of Directors and he clearly stated that "Charles, I just have to let you go now". "I will pay you a week's salary for every year served". **A retaliation and prejudice action, in my opinion.**

**OTHER FACTS TO BE CONSIDERRED:**

1. On various occasions, while on the phone with Evans, during the lengthy due diligence procedures leading to the SPA being successfully executed; he complained on few occasions that he cannot understand me. In such instance, Gene will literally repeat what I said and Evans will be okay.

2. I was not privileged to the draft copy of the Securities Purchase Agreement ("SPA"), asking for my replacement. In retrospect, I was wondering why I was not copied on the loan funding documents? The SPA, in most cases is from the Broker and the Financing Company, shared with the CEO. Hence, Gene agreed to the replacement clause in advance of the funding. This is unusual since the mere $1 million loan was fully collateralized by the entire Company's Intellectual Properties. This clause has never been part of our many previous financing documents.

3. My replacement, Mr. James Clavijo ("James"), is younger than I am and a friend of Mr. Evans Maryanthopolis ("Evans") of the GPB Debt Holdings  LLC ("GPB"). James is a Certified Public Accountant, just like me.

4. On February 13, 2016 I sent an email to the Directors, Auditors and Outside Legal Counsels of the Company, regarding a potential SEC and FINRA violations. – See Exhibit No. 1

5. James's Contract for Consulting Agreement did not indicate that he was to be the CFO, just a Consultant and clearly stated that he was to be paid in advance. An unethical stand from GPB, considering that my salaries were deferred and still not paid in full, till today – See Exhibit No. 2

6. On February 13, 2016, the day that I sent the email to the Board of Directors, etc., Gene told some staff that "I guess we will have to let Charles go". We may have to ask some staff under Oath for a statement.

7. James's Contract, indicated that the Company will have to pay his salary in advance, as well as pay for his hotel and flights – See Exhibit No. 2. If the Company was managing funds, as claimed in the Company's Response, then this action is clearly a waste of funds. More importantly, I had successfully performed the same duties for over 8 years.

8. It should be noted that the Company had various multimillion dollars funding, within my tenure as the Controller, in the past.

9. The Company implied that Gene kept me on for seven weeks trying to convince GPB to retain me. This was an obvious misrepresentation. The fact was that I was informed by Gene to file the two (2) SEC Reports, The Annual Report and the Re-Sale Registration Statements Form S-1 as fast as possible. The Annual Report was not due till March 31, 2016; however, Gene wanted it filed sooner. I was successful in filing the Annual Report on March 15, 2016. Furthermore, I was also successful at filing the Re-Sale

Registration Statement on Friday, March 25th, 2016. Only to be terminated on Tuesday March 29th, 2016; with only the New Financing Registration Statement to be filed. I guess that was reserved for James, a friend of GPB - the Investor.

10. I felt clearly used, not appreciated and fell a victim of GPB. It should be noted that James's Contract listed those two Reports that I successfully filed, as part of why he was hired on February 28th, 2016. James was neither on site nor worked on either Report.

11. On February 12, 2016, I was copied on an email sent by James to Gene; the email clearly stated that **"Charles cannot be in charge of the process". – See Exhibit No. 5.**
It is obvious that I wasn't intended to receive the email. Unless there is hidden agenda, I see no reason why I should not be part of a process that I had successfully managed for over 8 years.

**12.** The new funding was to be processed through GPB and Aquarius, as Lead Investors. Obviously, GPB will rather have "a Friend" in charge of this new funding Registration Statement role. **Not surprising that Gene and GPB wanted me out!!!**

13. It should be noted that I had successfully filed numerous Re-Sales and New Registration Statements for the Company in my over 8 year's tenure.

14. It should also be noted that James was referred to as "an Expert CFO" in SEC filings. However, his first two quarterly SEC Filings were late, causing the Company more money and efforts. I can say that in over eight years, all my numerous fillings with the SEC were both timely and successful. Maybe, I should have been the CFO, since I never had a CFO direct report. I reported directly to the CEO, in all my tenure with the Company. I should also have been paid the equivalent of James salary ($8,500 Bi-weekly = $221,000 annually) which is more that my annual gross salary of $179,200. A $41,800 or over 23% increase over my pay, not counting the added cost of hotels and flights. After all, I am a Certified Public Account with almost 30 years of professional experience. James obviously has less years of professional experience.

15. Gene, in his email to me dated March 29th, 2016 clearly stated that my termination has nothing to do with my performance – See Exhibit No. 3.

16. In the same email, of March 29, 2016, Gene stated that he will be getting back to me on few issues, Back pay and Severance to be paid. The follow up letter never came to date.

17. Ms. Dianne Meyers was an HR Trainee at the time of my termination and was not present at my exit interview with Gene, as stated in the Employee Handbook. It is obviously inconsequential to go back and report a discrimination observation to her, after the facts.

18. My replacement, described as an Expert CFO, was asking me some work related question via email on the day I was terminated and replaced by him – See Exhibit No. 4. In other word, I should be expected to train my own replacement.

19. My separation letter stated that I was terminated for "lack of work". Clearly, not the case – See Exhibit No. 6

20. I was terminated on March 29th, 2016 and my health benefit was terminated on March 31st, 2016. Whereas, when Gene terminated a shared Administrative Assistant, Jacque Tapley, a 62 years old female Caucasian, Gene requested that the Company provide a three months free health coverage to her. It should be noted that I had worked for the Company for 8 ½ years and my health benefit was terminated in just 2 days, regardless of my health condition. I am a Type 2 Diabetic on Insulin. Gene is clearly aware of my heath condition.

As stated above, it is clear that my Rights were violated, I was discriminated against, used, not paid any of my deferred salaries, unused vacation and severance pay; all of which are over $100, 000 by my calculations; and retaliated against by Gene, for my email to the Board of Directors, etc.

It is almost a year since my separation from the Company and I have not been able to secure any employment. Now, I know why the EEOC protects the Class of 55 years and older employees.

- The Company had raised substantial funds, several hundreds of thousand dollars, since my separation, yet I was not paid a dime of my earned but deferred salaries. I'm sure that James is still being paid in advance. **This is punitive, at the minimum.**
- The Company can afford to retain a paid Legal Representation, I cannot.
- I am being evicted from my home due to lack of payment. I am still hoping that the Company will be responsible in paying me my earned but deferred salaries and vacation days, as well as, severance pay that was promised by Gene at the exit interview. He said that I should receive a week's pay for every year of service.
- My health had deteriorated, so much, due to the accompanying stress and untimely medication. I was paying out of pocket expenses for my medications.
- I have been subjected to a separation from my family. A feeling of total failure.
- I have been humiliated by creditors, friends and family for unpaid loans.
- Bankruptcy is my next option, when I can afford the filing fees.
- As of this writing, I am literally homeless and on public support.

**THE COMPANYS' ACTIONS WERE GROSSLY INRESPONSIBLE, DISCREMINATORY, PUNITIVE AND RETALITATIVE.**

**I SERVED THE COMPANY DELIGENTLY AND FIDICUALLY FOR MANY YEARS.**

**I THINK THAT WE SHOULD LET THE JUDGE OR JURY DECIDES.**


Sincerely,

1/30/2017

Charles Rufai

cc: Ms. Sharon Robertson of EEOC – via email

# EEOC FILING

# ATTACHMENT NO. 1

# 2 PAGES

# Charles Rufai

| | |
|---|---|
| **To:** | Gene Cartwright |
| **Cc:** | Michael C. James (mjames@inergetics.com); jimhoff@imhoffeye.com; Niloff, Jonathan (jonathan.niloff@mckesson.com); 'M. D. Linda Rosenstock' (lindarosenstock@ph.ucla.edu); dochart99@att.net; Rick Fowler; Mark Faupel; Bill Wells; Heith D. Rodman (hdrodman@JonesDay.com); talongi@uhy-us.com |
| **Subject:** | Potential Violation of FINRA, SEC, Sarbanes - Oxley & PCAOB Rules |
| **Attachments:** | GUIDED - CLAVIJO CONSULTING AGREEMENT -02-13-15.pdf |

Gene,

Good day and hope all is well.

As a CPA, with a Publicly Traded Company, I'm fiducially responsible to protect Management and Shareholders. Currently, I am noticing potential violations that can seriously harm the Company's Management and the Shareholders. I just have to place these on the Records.

The Use of Proceed, in any Public Financing Document is usually general. It is one thing for an Investor to generally and not specifically advise their Clients. It is a different story when the Investor imposes, 'A day to day' conditions on their Client.
That could be construed as "CONTROLLING". Controlling by an Investor, can be viewed as having Insiders' knowledge of their Client's nonpublic information. Clearly, a violation of FINRA, SEC, Sarbanes -Oxley & PCAOB Rules.
Granted that the Company can benefit, tremendously, from having a CFO with good understanding of Complex Debt & Equity Financing. That way, Financing activities and Reporting will be separated from General Accounting Controlling. However, the 'CFO Placement' should not be imposed by an Investor.

- Seeking permission from Evan of GPB, our most resent Investor, on what bills to pay and when to pay it, should not be encouraged.
- Placement of a CFO by Evan is also not a good Idea.
- Lastly, it is unethical to **prepay** a Consultant for the entire month, while employees that were laid off and those still working have not been paid for the past 3 months.
- Furthermore, the same people that imposed the "Consultant" on the Company requested that he should be **prepaid**, while the outstanding salaries were requested to be paid at only 50% of what is owed. Both illegal and unethical.

As you are aware that I am a type II diabetic, the news that James the "Consultant" is coming to perform the functions that I have performed successful, for the past 7 years had triggered my glucose level, very badly. I have attached his Consulting Agreement, for your review.
I will need to go home and rest it off. I cannot go to my doctor, since the health premium for February has not been paid and I have no cash to pay out of pocket, since I have not been paid for the past 3 months.
I may have limited access to internet from home, since my Cable bill is past due. My Cell may work, sometimes, since I have a payment arrangement with AT&T, not sure when it will be off.

All other Managers are not at work today, or as of now.
I have given as much instruction that I could to the Accounting Department staff.
I have given James Consulting Agreement to the 2 Auditors on site and advise them to expect his arrival.
I will login, as best as I could.

Sincerely,

Charles

# EEOC FILING

# ATTACHMENT NO. 2

# 4 PAGES

# CONSULTING AGREEMENT

**THIS CONSULTING AGREEMENT** (the "Agreement") is made and entered into by and between Guided Therapeutics, Inc. (the "Company") and/or ("Guided Therapeutics") and James Clavijo of Capital View Partners ("Consultant") with reference to the following facts.

## RECITALS:

A. Guided Therapeutics is a Company focused on developing technologies that detects the diseases that lead to cancer.

B. Consultant possesses unique skills and experience in the areas of Finance, Accounting and Administration and is in the business of providing consulting services in such areas.

C. Guided Therapeutics wishes to engage Consultant to provide services within Consultant's area of expertise, and Consultant wishes to accept such engagement, on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** the parties hereto, intending to be legally bound, agree as follows:

## 1.    SERVICES TO BE PERFORMED BY CONSULTANT

1.1    **Specific Services.** Consultant agrees to assist Guided Therapeutics by providing the following consulting services:

1.1.1    **Preparation of Financial Statements**
1.1.2    **Completion of 2014 and 2015 Audits**
1.1.3    **Completion of S1 Filing and/or up-listing**
1.1.4    **Other Financial and Accounting matters as directed by Company.**

1.2    **Method of Performing Services.** Consultant shall determine the method, details, and means of performing the above-described services.

1.3    **Period of Service.** Consultant will provide his services from February 15, 2015 on an on-going basis. Changes in service may be renewed, revised or terminated upon mutual agreement of both parties.

1.4    **Status as Independent Consultant.** Consultant acknowledges and agrees that, in performing services pursuant to this Agreement, Consultant shall be serving as an independent contractor. Consultant acknowledges and agrees that he is not an employee of Guided Therapeutics and agrees that he is not entitled to any rights or benefits afforded to Guided Therapeutics employees. Consultant shall be responsible for procuring at her own expense all Workers' Compensation insurance, disability insurance, unemployment insurance, permits, licenses and

other requirements for himself and for any employees engaged by Consultant to assist in the performance of services under this Agreement.

**1.5**    **Payment of Taxes.** Consultant agrees that he is solely responsible for paying when due all income taxes, including estimated taxes, payroll taxes, and other taxes incurred as a result of the fees and expenses paid to Consultant for services rendered under this Agreement.

**1.6**    **No Authority to Bind.**    At no time during the term of this Agreement shall Consultant make any commitment or representation that would in any way obligate or bind Guided Therapeutics without specific written authorization and/or direction.

## 2.    COMPENSATION

Guided Therapeutics shall compensate Consultant for services rendered pursuant to this Agreement as follows:

**2.1**    **Base Fee.** Guided Therapeutics agrees to pay a fixed monthly consulting fee of **$8,500.00** per month for the services to be provided pursuant to this Agreement. This retainer shall be paid in advance for each month and at the Consultant's commencement of services pursuant to this Agreement.

**2.2**    **Expense Reimbursements.**    In addition, Guided Therapeutics agrees to reimburse Consultant for his/her travel and lodging expenses and other incidentals as pre-approved. The Company realizes that Consultant does not live in the Company's location, so all necessary travel expenses will be reimbursed by Company.

**2.3**    **Warrants/Options.** In addition, Guided Therapeutics agrees to issue Common Stock Options ("Options") to Consultant. Options will be governed by a separate Stock Option agreement. Options are to be provided when a new issuance to management is made and on the basis of what is customarily offered to a CFO for a small public medical device company. In the event of a change in control all scheduled Options will become issued and vested.

## 3.    PROPRIETARY INFORMATION

**3.1**    **Protection of Confidential Information.**
In conjunction with Consultant's provision of services under this Agreement, it may be necessary to provide Consultant with access to trade secret information or other information considered proprietary or confidential to Guided Therapeutics, ("Confidential Information"). Consultant agrees to use all reasonable efforts to safeguard Confidential Information from unauthorized use or disclosure, and to maintain the confidentiality of such information. Consultant agrees to refrain from using or disclosing Confidential Information for any purpose other than the

performance of consulting services under this Agreement without prior written consent.

**3.2    Survival of Duty to Protect Company's Confidential Information.** Consultant agrees that upon termination of this Agreement, Consultant will promptly and without request return all Confidential Information and all other data or documents (and all copies thereof in any format) pertaining to Guided Therapeutics or its business that came into Consultant's possession or control during this engagement pursuant to this Agreement.

4.    **TERMINATION OF AGREEMENT**

**4.1    Expiration of Agreement.** This Agreement shall commence effective as of the date indicated in Paragraph 1.3, and, unless earlier terminated as provided elsewhere below, shall continue in effect until end date indicated in Paragraph 1.3, or until Consultant completes the services he has been engaged to deliver.

5.    **GENERAL PROVISIONS**

**5.1**    Nothing in this agreement is intended, nor do any parties intend, to have James Clavijo perform any services for Guided Therapeutics that could in any manner violate any law or other regulation. Guided Therapeutics acknowledges that James Clavijo will have no liability to Guided Therapeutics or any other part arising from James Clavijo's work, consultation or advice.

**5.2    Release of Claims.** Guided Therapeutics and its stockholders, owners, agents, directors, officers, employees, insurers, representatives and insurers hereby release and forever discharge James Clavijo of, from and against any and all manner of action or actions, cause or causes of action, in law or in equity, claims, suits, debts, liens, promises, liability, demands, damages, loss, cost or expenses of, based upon, or relating to the engagement of James Clavijo, if Guided Therapeutics asserts, or files with any court or agency, any claim or cause of action which is a released Claim under the Release, Guided Therapeutics agrees that this Release shall constitute an absolute defense to any such claim or cause of action. Guided Therapeutics agrees it will reimburse James Clavijo for all costs and attorney fees in incurred in connection with James Clavijo response or defense of any claim or cause of action asserted by Guided Therapeutics or on its behalf that is determined to be a released claim under this Release. This Release and Agreement shall be governed by Florida law, irrespective of any rules related to conflicts of laws.

**5.3    Entire Agreement.** This Agreement supersedes any and all agreements, either oral or written, between the parties with respect to the rendering of services by Consultant for Guided Therapeutics and contains all representations, covenants

and agreements between the parties with respect to the rendering of services by Consultant. Any modification of this Agreement will be effective only if it is in writing and signed by the party to be charged.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement effective as of the date set forth above.

**Consultant/ Capital View Partners**

**Guided Therapeutics, Inc.**

By

James Clavijo,

By:

Title: CEO

# EEOC FILING

# ATTACHMENT NO. 3

# 1 PAGE

**From:** Gene Cartwright <gcartwright@guidedinc.com>
  **To:** charlesrufai <charlesrufai@aol.com>
**Subject:** I will follow up
  **Date:** Tue, Mar 29, 2016 11:52 am

Charles,

Here is the information that I still owe you.

You remain our distributor for Nigeria

I will confirm the severance that we will pay

I will confirm the back pay

I will write a letter explaining why you were let go, which obviously has nothing to do with your performance.


Gene

# EEOC FILING

# ATTACHMENT NO. 4

# 3 PAGES

Unpaid payroll

**From:** James Clavijo <cpaclavijo@gmail.com>
    **To:** charlesrufai <charlesrufai@aol.com>
**Subject:** Unpaid payroll
    **Date:** Tue, Mar 29, 2016 1:50 pm

Charles,

Ola, doesn't appear to have  a schedule showing what is owed to each employee and any interest etc. that may be owed, do you know where I may find that?

Warm Regards,

---

**James Clavijo, CPA, MA**

Mobile: 305.304.7700
Int'l. 001.305.304.7700
Skype: cpaclavijo
Email: cpaclavijo@gmail.com
Twitter: @lordcpa
LinkedIn: Linkedin Profile

LEGAL DISCLAIMER
The information transmitted is intended solely for the individual or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of or taking action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you have received this email in error please contact the sender and delete the material from any computer.

Tax Returns

**From:** James Clavijo <cpaclavijo@gmail.com>
    **To:** charlesrufai <charlesrufai@aol.com>
    **Cc:** Gene Cartwright <gcartwright@guidedinc.com>
**Subject:** Tax Returns
  **Date:** Wed, Mar 30, 2016 9:24 am

---

Can you tell me the status of Tax Returns? Federal and State for the Corporation? Where would I find those? Was extension filed for this year, where would I find those?

Were the 940 and 941 and state unemployment filed for 4Q 2015 and prior? Where would I find those?

Can you tell me if there are any other tax or employee related compliance matters that need to be addressed now or in the near term?

Thank you,

---

**James Clavijo, CPA, MA**

Mobile: 305.304.7700
Int'l. 001.305.304.7700
Skype: cpaclavijo
Email: cpaclavijo@gmail.com
Twitter: @lordcpa
LinkedIn: Linkedin Profile

LEGAL DISCLAIMER
The information transmitted is intended solely for the individual or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of or taking action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you have received this email in error please contact the sender and delete the material from any computer.

Payroll

From: James Clavijo <cpaclavijo@gmail.com>
   To: charlesrufai <charlesrufai@aol.com>
   Cc: Gene Cartwright <gcartwright@guidedinc.com>
Subject: Payroll
   Date: Wed, Mar 30, 2016 9:04 am

Charles,

Can you tell me where I could find the schedule detailing what is owed to each employee in backpay or deferred pay, etc. and/or the reconciliation of the accrued payroll/payroll expense by employee?

Thank you

---

**James Clavijo, CPA, MA**

Mobile: 305.304.7700
Int'l. 001.305.304.7700
Skype: cpaclavijo
Email: cpaclavijo@gmail.com
Twitter: @lordcpa
LinkedIn: Linkedin Profile

LEGAL DISCLAIMER
The information transmitted is intended solely for the individual or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of or taking action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you have received this email in error please contact the sender and delete the material from any computer.

# EEOC FILING

# ATTACHMENT NO. 5

# 1 PAGE

**Charles Rufai**

| | |
|---|---|
| **From:** | James Clavijo <cpaclavijo@gmail.com> |
| **Sent:** | Friday, February 12, 2016 9:44 AM |
| **To:** | Gene Cartwright |
| **Cc:** | Charles Rufai |
| **Subject:** | Re: please discuss with Charles |

Gene

I think it is important that I am there for the Audit at the beginning stages. I will stay out of Charles' hair, I just need to know where the documents are and I can build from there. Charles can't be in charge of driving this process. Let me know if you want to discuss.

Warm Regards,

_____

**James Clavijo, CPA, MA**

Mobile: 305.304.7700
Int'l. 001.305.304.7700
Skype: cpaclavijo
Email: cpaclavijo@gmail.com
Twitter: @lordcpa
LinkedIn: Linkedin Profile

LEGAL DISCLAIMER
The information transmitted is intended solely for the individual or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of or taking action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you have received this email in error please contact the sender and delete the material from any computer.

On Fri, Feb 12, 2016 at 9:38 AM, Gene Cartwright <gcartwright@guidedinc.com> wrote:

James,

As I mentioned, we're short staffed right now and not as prepared as we normally are for the audit.

We're looking forward to you're coming next week, but I think that it would be helpful for Charles given the audit if you could come later in the week rather than earlier.

Please discuss this with Charles when you talk to him this afternoon.

I'm sure that the two of you can work something out.

UNITED STATES DISTRIC COURT
NORTHERN DISTRICT OF GEORGIA

CHARLES A. RUFAI,                          )

                          Plaintiff,        )
                                            )
vs.                                         )          Civil Action No.

                                                       **COMPLAINT AND JURY TRIAL
                                                       DEMAND**

                                            )
GUIDED THERAPEUTICS, INC                   )
MR. CARTWRIGHT S. CARTWRIGHT –
PRESIDENT & CEO - DIRECTOR
MICHAEL C. JAMES -DIRECTOR
JOHN E. IMHOFF - DIRECTOR
LINDA ROSENSTOCK - DIRECTOR
JONATHAN NILOFF - DIRECTOR
GPB DEBT HOLDINGS II, LLC
EVANS MYRIANTHOPOULOS,
Individually, Jointly, severally and in
the Alternative.

                          Defendants.

## CERTIFICATE OF COMPLIANCE

I hereby certify that the within **COMPLAINT AND JURY TRIAL DEMAND**
has been prepared in compliance with Local Rule 5.1 by using Times New Roman,
14-point font.

Very Truly Yours,

Charles A. Rufai, Pro Se        This ....11TH..... day of ..JUNE..., 2018